# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARNOLD LANE, | ) |
| *Plaintiff,* | ) Civil Action No: 15-01568 |
| v. | ) (PGS)(LHG) |
| LAYLA SCHADE, ADAM HUBERT, | ) |
| MICHAEL ANTCZAK, and BRUCE LANE, | ) **MEMORANDUM** |
| | ) **AND** |
| *Defendants.* | ) **ORDER** |

This matter comes before the Court on Defendants' Motion for Summary Judgment pursuant Federal Rule of Civil Procedure 56(c). (ECF No. 62). Plaintiff Arnold Lane asserts federal civil rights claims under 42 U.S.C. § 1983 and *Bivens*. For the reasons set forth below, Defendants' Motion for Summary Judgment will be granted in part and denied in part.

On July 13, 2014, Lane visited the Sandy Hook area of the Gateway National Recreation Area. (Pl.'s Statement of Facts in Opp., ECF No. 70-1, at ¶1). After spending the day at the beach, Lane walked from the beach to his car that was located in the parking lot to make a phone call. (Dep. Of Pl. Arnold Lane, ECF No. 62-14, at 64). Lane carried with him everything he had brought to the beach that day, including a beach chair, back pack, beach umbrella, and an insulated bag for keeping food cold. (ECF No. 62-14, at 61-64). Lane walked to his car, placed the items he was carrying inside the trunk, and opened the door to sit inside his car. (ECF No. 62-14, at 78).

At this time, Defendant Layla Schade, a National Park Service Ranger, was seated in her law enforcement vehicle, facing the pedestrian footpath from which Lane had emerged. (Tr. Of Trial, Feb. 18, 2015, ECF No. 62-5, at 7-8). Schade noticed Lane walk to his car, and saw that he was carrying a "grocery sack that was full of what appeared to be several cans." (*Id.*) Schade explained that the cans "appeared to be beer cans." (*Id.* at 8.) Schade also explained that she noticed Lane

1

specifically because he was "staring" at her vehicle. (*Id.*) Schade explained, "He was staring at our vehicle as he walked from the pedestrian foot path towards the . . . parking lot . . . as he was walking, simply staring directly at the [law enforcement] vehicle, looking towards his vehicle, then staring back at our vehicle." (*Id.*) Schade found this odd because "of all the hundreds of people that I've seen walk by us, they generally don't focus their attention as intently on us as that." (*Id.*) Additionally, Adam Huber, a United States Park Ranger on patrol with Schade that evening, observed Lane looking that them. (*Id.* at 69). Huber explained, "[H]e eyeballed us. He turned and looked, stared at us for quite a while, and . . . he looked away. He did that two more times, which I thought was suspicious." (*Id.*)

Based on her observation of the grocery bag filled with cans and the way that Lane had "stared" at her law enforcement vehicle, Schade approached Lane and asked whether he had been drinking. (ECF No. 62-14, at 79). Lane responded, "yeah, when I first got on the beach I think I had like one beer or something like that." (*Id.* at 80). Schade next asked if she could perform a field sobriety test, and Lane responded, "sure . . . why not." (*Id.*) Schade administered three field-sobriety tests: the horizontal gaze nystagmus test, the walk-and-turn test, and the one-leg-stand test. (ECF No. 62-5, at 15-16). On the horizontal gaze nystagmus test, Schade determined that Lane failed five out of six standard cues of impairment. Specifically, Schade found Lane had a lack of smooth pursuit in his left eye, a lack of smooth pursuit in his right eye, distinct and sustained nystagmus in his left eye; distinct and sustained nystagmus in his right eye; and an onset of nystagmus prior to 40 degrees in his left eye. (Incident Report, ECF No. 62-6, at 2). Schade next determined that Lane passed the walk-and-turn test and the one leg- stand test. (*Id.*) Schade also administered a portable breath test, however, Defendants allege that Lane was "unable or unwilling" to provide an adequate breath sample. (ECF No. 62-5, at 20-21). In contrast, Lane maintains that the breathalyzer test was not working properly, or that Schade administered it wrong and it was thus inconclusive. (ECF No. 70-1, at ¶12).

2

Schade then placed Lane under arrest on suspicion of public intoxication based on the following: Lane's failure of the horizontal gaze nystagmus test, the fact that he had admitted drinking earlier that day, because "smelled strongly of alcohol," and that he had a "shuffling" gait while walking to his vehicle. (ECF No. 62-6, at 3). Plaintiff supports that at the time of his arrest, there was no evidence that he was publicly intoxicated. (ECF No. 70-1, at ¶ 11).

After placing Lane under arrest, Schade and Hubert searched Lane's vehicle and found a plastic bag containing nine empty cans of beer in the vehicle's trunk, and a prescription pill bottle with a label that indicated it contained hydrocodone/acetaminophen (generic Vicodin) with a "fill date" of June 5, 2012. (ECF No. 62-6, at 3; Photo Log, ECF No. 62-9; Photo Log, ECF No. 62-8). When Schade arrested Lane, she performed a search of his person incident to arrest. (*See* Schade's Resps. to Interrogs., ECF No. 62-7, at 6). Schade explained that during the search, she felt a "metal object" in his pocket, and after determining that Lane was wearing a bathing suit underneath his pants, she asked Lane to remove his pants to obtain the metal object. (*Id.* at 5-6). Lane contends that this search was a strip search in a public parking lot; however, Schade contends that Lane wore his bathing suit during this search. (*Id.*)

After searching Lane, Schade handcuffed him and placed him in the back of the law enforcement vehicle that she and Hubert had been driving. (ECF No. 62-6, at 3). Lane remained handcuffed during the approximately five minute drive to the Sandy Hook holding facility. (ECF No. 62-14, at 128). During the drive, Lane complained that his handcuffs were too tight and causing him pain. (*Id.*) The handcuffs were removed once he was placed in a holding cell, after arriving at the facility. (ECF No. 62-6, at 3).

After being placed in the holding cell, Lane began to complain of wrist pain, and the rangers called a Sandy Hook emergency medical technician to treat Lane. (EMT Report; ECF No. 62-11). At that time, the EMT found there was no swelling in Lane's wrists, no visible marks, and no bleeding. (*Id.*) The EMT determined that Lane had good movement in both hands; "good cap

3

refill"; "vitals within normal limits"; "no other complaints"; "no other findings upon exam"; and "no need for transport to hospital;" he was then given an ice pack. (*Id.*) According to Lane, he wore a splint on his right wrist for "a few weeks" after this incident. (ECF No. 62-14, at 193). In his statement of undisputed facts, Lane contends that when X-rays of his wrist were taken, an injury was shown; however, in his deposition he stated that he not suffer any injury apart from the alleged wrist pain. (ECF No. 70-1, at ¶ 29; ECF No. 62-14 at 129).

Lane was held in the holding cell until approximately 1:30 a.m. or 2 a.m., and after he provided a breath sample that indicated it was safe for him to operate a car, he was released. (*See* ECF No. 62-6, at 6). Lane was charged with public intoxication, unlawful possession of prescription drugs, and interference with agency functions. (*Id.*) Lane alleges that when he was released, he was ordered not to return to Sandy Hook pursuant to a policy entitled "Standard Operation Procedures and Guidelines for Disposition of Offenders/Enforcement Action at the Sandy Hook Unit of Gateway." (*See* Amended Complaint, ECF No. 38, at ¶¶ 49-55). These guidelines explain that when a visitor is arrested at Sandy Hook and required to appear in court, the visitor "may be issued a lawful order to leave the Park and not to return until the case has been resolved either by payment of the collateral forfeiture or by judicial or U.S. Attorney decision." (*See* Standard Operating Procedures, ECF No. 62-13, at 2).

A trial was held on February 18, 2015. At the conclusion of testimony, the judge found that "the Government failed to sustain its burden of proof in each of these charges," and acquitted Lane. (ECF No. 62-5, at 93). Despite Lane's acquittal, the judge found that his arrest was appropriate, explaining:

> [Lane] got himself arrested through his actions and his responses to their questions. Had he acted any differently, we wouldn't be here going through the trial of this case. I think that based upon the things that he did and responses that he gave, these rangers acted properly in every single thing that they did.

(*Id.* at 92).

4

Based on these facts, Lane brought thirteen causes of action against Defendants: (1) deprivation of federal civil rights; (2) unlawful seizure of person; (3) excessive force; (4) false arrest; (5) unlawful search and seizure of property; (6) cruel and unusual punishment; (7) malicious abuse of process; (8) conspiracy to violate civil rights; (9) violation of the equal protection clause; (10) a claim for "declaratory relief" seeking "issuance of a temporary and permanent injunction against Defendants and their unconstitutional policies and procedures;" (11) "joint and several liability";[1] (12) a claim under New Jersey law for "violation of New Jersey Civil Rights;" and (13) a claim under New Jersey law for "joint and several liability." (*See* ECF No. 38, at ¶¶ 64-121).

## **STANDARD OF LAW**

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

---

[1] The Court will grant summary judgment to Counts XI and XIII of the complaint as joint and several liability is not a cause of action. *See Bullock v. Ancora Psychiatric Hosp.*, No. 10-1412, 2011 U.S. Dist. LEXIS 92307, 2011 WL 3651352, at *12 (D.N.J. Aug. 18, 2011) ("New Jersey's joint-and-several liability statute does not create an independent basis for tort liability.").

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, after drawing all inferences in favor of the non-moving party, and making all credibility determinations in his favor "that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. App'x. 222, 227 (3d Cir. 2007).

## ANALYSIS

### I. Unlawful Search and Seizure and False Arrest (Claims I, II, IV and V)

Lane asserts a claim of unlawful search and seizure and false arrest against Defendants, arguing that probable cause for the arrest and subsequent searches did not exist. In response, Defendants argue that probable cause existed for the arrest and subsequent search of Lane and his vehicle, and even if probable cause did not exist, they are entitled to qualified immunity for their conduct.

Ordinarily, police may arrest an individual based upon probable cause. *See O'Connor v. City of Phila.*, 233 F. App'x 161, 164 (3d Cir. 2007). An individual can bring a claim for false arrest when probable cause to form the basis of an arrest is absent. *Id.* To sustain a claim for false

arrest, a plaintiff must establish: "(1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995). In the context of a false arrest claim, the inquiry is "not whether the person arrested in fact committed the offense, but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988).

Regarding the Defendants qualified immunity argument, the Supreme Court recently re-affirmed the principles of qualified immunity in the context of warrantless arrests in *District of Columbia v. Wesby*, 138 S. Ct 577 (2018). There, the Court explained that law enforcement officers are entitled to qualified immunity unless: "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Wesby*, 138 S. Ct. at 589. The Court explained that "[c]early established means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every reasonable official would understand that what he is doing is unlawful." *Id.* (citations omitted). This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* However, "a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002).

In this case, a genuine issue of material fact exists as to whether Defendants had probable cause to arrest Lane for public intoxication. Lane argues that, at the time of his arrest, there was no evidence that he was intoxicated. In contrast, Defendant's argue that probable cause existed. At Lane's criminal trial, Schade testified that she initially noticed Lane because he was "staring"

at the law enforcement vehicle, and he was carrying a grocery bag that appeared hold several cans, which she surmised to be beer cans. Schade further contends that Lane looked suspicious because of his "shuffling gate" while walking. After Lane placed the grocery bag containing the cans in his trunk, Schade stopped Lane, and asked if he had been drinking. Lane responded that he had been drinking earlier that day, and consented to perform a field sobriety test. Schade noticed that Lane smelled of alcohol.

Lane passed two of the three field sobriety tests performed. Additionally, the portable breath test results were inconclusive. Still, Schade placed Lane under arrest for public intoxication. Schade supported Lane's arrest based on her observation of Lane's "odd" behavior of "staring" at the law enforcement vehicle, his "shuffling gate" as he walked to his car the grocery bag that she had seen from a distance that she believed contained beer cans, and that Lane smelled of alcohol. However, at the time of his arrest, the grocery bags containing the cans were in the trunk of Lane's vehicle, and it was only after his arrest that the cans were discovered to be beer cans. Additionally, Lane may have had a "shuffling gate" while walking because he was carrying several items at once back to his car, including a beach chair, back pack, beach umbrella and an insulated food bag. Further, simply looking or "staring" at a law enforcement vehicle is not enough to give rise to probable cause to arrest an individual for public intoxication. Finally, Lane passed two out of three field sobriety tests, and the results of the portable breath test were inconclusive.

In short, based on the record, a genuine issue of material fact exists as to whether Defendants had probable cause to arrest Lane for public intoxication. Moreover, if Defendants did not have probable cause to arrest Lane, the subsequent warrantless searches of his vehicle and person were unlawful. Consequently, a decision on qualified immunity will be premature as there are unresolved disputes of historical fact regarding the arrest. For these reasons, summary judgment on Counts I, II, IV, and V are denied.

## II. Excessive Force (Count III)

Lane alleges that he was subjected him to excessive force when placed in handcuffs, as the handcuffs were "too tight" around his wrists. Lane claims that he "suffered a loss of sensation or discomfort in his wrist, which is a lasting injury." (ECF No. 38, at ¶¶ 73-74). "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quotations omitted). In certain cases, handcuffs that are excessively tight "have been found to constitute excessive force." *Clifton v. Borough of Eddystone*, 824 F. Supp. 2d 617, 631 (E.D. Pa. 2011) (citing *Kopec*, 361 F.3d at 777-78). For example, in *Kopec*, after the plaintiff was placed in handcuffs, he began to lose feeling in his right hand. *Kopec*, 361 F.3d at 776. The plaintiff complained of "unbearable pain," and "begged" the police officer to loosen the handcuffs. *Id.* The plaintiff then began to faint from the pain, and as a result of the excessively tight handcuffs, suffered nerve damage in his right wrist. *Id.*

In contrast, in *Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005), the plaintiff was kept in handcuffs for approximately three to four hours. There, the plaintiff alleged that he informed the police officers that he was in pain; however, the plaintiff did not portray any "signs of discomfort," nor did he seek or receive any medical treatment after. *Gilles*, 427 F.3d at 208. Consequently, because he did not display "obvious visible indicators" of pain, the court determined summary judgment was proper on the plaintiff's claim of excessive force. *Id.* Courts have granted summary judgment on similar claims of excessive force do to excessively tight handcuffs. For example, in *Clifton v. Borough of Eddystone*, 824 F. Supp. 2d 617, 631 (E.D. Pa 2011) the plaintiff brought a claim of excessive force after she remained in handcuffs for around three or four hours. Though the plaintiff complained that the handcuffs were too tight, she did not portray any "obvious visible indicators of pain." *Id.* at 631. As a result, the court granted summary judgment to the officers against plaintiff. *Id.*

9

Here, like in *Gilles* and *Eddystone*, though Lane complained about his handcuffs being tight, he did not display any obvious visible indicators of pain. Additionally, the EMT who examined Lane found he had "good movement in both hands; "good cap refill"; "vitals within normal limits"; "no other complaints"; "no other findings upon exam"; and "no need for transport to hospital." Even more, the photographs of Lane's wrists do not show any indicators of any injury, such as cuts, bruises, or any swelling. Though Lane contends that he suffered an injury to his wrist, he offers nothing to support that conclusion. For these reasons, summary judgment on Count III is granted.

### III. <u>Uncomfortable Conditions of Confinement (Claim VI)</u>

Lane alleges that he was subjected to "cruel and unusual punishment" by Defendants when they "assaulted and accosted him without any warning or indication . . . [and] after he was already handcuffed," by requiring him to "sit for approximately eight hours in a freezing cold cell wearing only boxer sized shorts while being subjected to verbal taunting and without being permitted to put on clothing," and by "tightening the handcuffs to the point of loss of sensation." (ECF No. 38, ¶¶ 84-90). In response, Defendants claim that Lane was placed in a cell for a brief period of time to ensure that he reached a level of sobriety that would allow him to safely operate his vehicle.

In this instance, the Eight Amendment's protections are not applicable to Lane because when the alleged cruel and unusual punishment occurred, he was detained prior to trial. Accordingly, when pretrial detainees, such as Lane, challenge their conditions of confinement, courts determine whether there has been a violation of the Due Process Clause of the Fourteenth Amendment. *See Hubbard v. Taylor*, 538 F.3d 229, 230 (3d Cir. 2008). "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* quoting (*Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Under the Fourteenth Amendment, unconstitutional punishment has both subjective and objective components. The objective component "requires an inquiry into whether the deprivation was sufficiently serious"

and is met when the condition of confinement is arbitrary, purposeless or excessive, while the subjective component "asks whether the officials acted with a sufficiently culpable state of mind," and is met when an individual "endure[s] genuine privations and hardship over an extended period of time." *Abdullah v. Cohen*, No. 18-1157, 2018 U.S. Dist. LEXIS 143673, at *6 (D.N.J., Aug. 23, 2018) (quoting *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007)). In order to state a violation of the Fourteenth Amendment, a plaintiff must allege facts that suggest the conditions of his or her confinement "were severe enough to deprive him [or her] of a basic human need, such as food, warmth[,] or exercise." *Id.*

Here, Lane's complaints regarding his conditions of confinement do not amount to "cruel and unusual punishment." Lane contends that he was paced in a "freezing cold cell" in boxer shorts. However, during his brief period of confinement, Lane "rested quietly" or "slept," and did not raise any complaints about his allegedly "freezing cold cell." (*See* ECF No. 62-7, at 7). Further, Lane has shown no facts that support these conditions amount to cruel or unusual punishment by Defendants. For these reasons, summary judgment on Count III is granted.

## IV. <u>Malicious Abuse of Process and Malicious Prosecution (Claim VII)</u>

Lane additionally brings claims for malicious abuse of process and malicious prosecution. In response, Defendants argue that the Supreme Court has never recognized a *Bivens* remedy for malicious abuse of process in the circumstances presented here, and in light of the Supreme Court' decision in *Ziglar v. Abbasi*, 137 S. Ct. 1834 (2017), this Court should not expand the *Bivens* remedy to a "new context."

In *Ziglar*, the Supreme Court explained that it has recognized a *Bivens* remedy only three times: (1) in *Bivens* itself, where a person was "injured by federal officers who violated the prohibition against unreasonable search and seizures"; (2) in *Davis v. Passman*, 442 U.S. 228 (1979) for gender discrimination, where an administrative assistant sued a Congressman after she was fired for being a woman; and (3) *Carlson v. Green*, 446 U.S. 14 (1980) for failure to provide

adequate medical treatment, after a jailer failed to treat a prisoner's asthma. *See Abbasi*, 137 S. Ct. at 1860. The Court explained that these cases "represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself," thus "expanding the *Bivens* remedy is now a disfavored judicial activity." *Id.* at 1855-57. "This is in accord with the Court's observation that it has consistently refused to extend *Bivens* to any new context or new category of defendants." *Id.* at 1857. As a result, the Court urged "caution before extending *Bivens* remedies into any new context." *Id.* (quotation omitted). The Court adopted the following test to determine if a case presents a new *Bivens* remedy: "If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Id.* at 1859. The court provided examples of differences that may make a given claim a new *Bivens* remedy:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

*Id.* at 1860.

In the present case, Lane seeks a *Bivens* remedy for both malicious abuse of process and malicious prosecution. Like in *Ziglar*, these claims do not resemble the claims the Court has previously approved. Accordingly, the Court will not recognize a *Bivens* remedy for Lane's claims of malicious abuse of process or malicious prosecution.

Further, even if this Court would recognize a *Bivens* remedy for these claims, these claims still fail. First, to raise a claim for malicious prosecution, a plaintiff must show: "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of

liberty consistent with the concept of seizure as a consequence of a legal proceeding." *McKenna v. City of Philadelphia*, 582 F.3d 447 (3d Cir. 2009).

Regarding the malicious prosecution claim, this claim was not raised explicitly in Lane's Amended Complaint; however, in his opposition brief, Lane makes clear he is raising a claim for malicious prosecution. Applying those elements to Lane's claims, his malicious prosecution claim must fail. Defendants did initiate a criminal proceeding, and after his arrest, lane was charged with public intoxication, unlawful possession of prescription drugs, and interference with agency functions. The criminal proceeding also ended in Lane's favor. At his criminal trial, the judge found that "the Government failed to sustain its burden of proof in each of these charges," and acquitted Lane. Further, regarding probable cause, a genuine issue of material fact exists as to whether Defendants had probable cause to arrest Lane for public intoxication. However, Lane has not shown that defendants acted maliciously, or for any purpose other than to bring him to justice. To support that Defendants acted with malice, Lane alleges that prior to his arrest, he had "previous interactions" with Defendants. Lane does not elaborate on the nature of the alleged previous interactions. Further, Lane offers no other support in the record to show how Defendants acted with malice. Accordingly, because Lane has not shown that Defendants acted maliciously or for a purpose other than bringing the him to justice, his malicious prosecution claim fails.

Second, a claim for malicious abuse of process "lies where 'prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by the law.'" *Rose v. Bartle*, 871 F.2d 331, 350 (3d Cir. 1989) (citing *Jennings v. Shuman*, 567 F.2d 1213, 1217 (3d Cir. 1977)). "Cognizable injury for abuse of process is limited to the harm caused by the misuse of process, and does not include harm (such as conviction and confinement) resulting from that process's being carried through to its lawful conclusion." *Heck v. Humphrey*, 512 U.S. 477, 486 n.5 1994. To establish abuse of process, "there must be some proof of a definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of [the] process."

*Ference v. Twp. of Hamilton*, 538 F.Supp.2d 785, 798 (D.N.J. 2008) (citations and internal quotation marks omitted).

Lane argues that "Defendants issued legal process to detain [him] and subject him to an unlawful seizure of his person, to an illegal and unlawful arrest, to excessive force, and to unlawfully subjecting his vehicle and property to a search and seizure." (Amended Complaint, ECF No. 38, at ¶¶ 91-95). Lane further contends that "Defendants' actions were designed to obtain collateral objective outside the legitimate ends of the legal process . . . [and] Defendants acted with intent to do harm without excuse or justification." (*Id.*) After a careful review of the record before the Court, there is nothing to indicate that Defendants maliciously abused process or were motivated by an ulterior motive. Aside from Lane's broad allegations in his complaint, Lane offers no other support for this argument.

For these reasons, summary judgment on Count VII is granted.

## V. Equal Protection Claim and Claims under New Jersey Civil Right's Act (Claims IX and XII)

Lane argues that the events described in the Amended Complaint violate his right to equal protection under the Fifth Amendment. "Although the Fifth Amendment does not contain an equal protection clause, the Supreme Court has construed the Fifth Amendment's Due Process Clause as containing an equal protection guarantee." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 305 n.112 (3d Cir. 2016) (citing *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991)). Accordingly, courts examine Fifth Amendment equal protection claims "under the same principles that apply to such claims under the Fourteenth Amendment." *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 317 (3d Cir. 2001).

Under the Equal Protection Clause of the Fourteenth Amendment, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985); *see also Renchenski v. Williams*, 622 F.3d 315, 337 (3d Cir. 2010). To raise a claim for a denial

of equal protection under the Fifth Amendment, a plaintiff must prove that he or she "received different treatment from that received by other individuals similarly situated." *Andrews v. City of Phila.*, 895 F.2d 1469, 1477 (3d Cir. 1990). Lane additionally alleges a violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2, which permits "any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States . . . [or] by the Constitution of laws of [New Jersey]" to bring a civil action for damages. N.J.S.A. 10:6-2.

Here, Lane has failed to show how he was treated differently from other persons who are similarly situated, or that any Defendant intended to discriminate against him. In his Amended Complaint, he claimed broadly that

> Defendants' treated [him] disparately when they stopped him for walking with an item in his hand on the same footpath as others and then intentionally arrested and charged him criminally where hundreds of others were allowed to walk on the footpath with items in their hand, Without any restriction. . . . Defendants' policies and practices in restricting Plaintiff's walking with an item in his hand based on his race while allowing other individuals to walk with items in their hand without restriction resulted in Plaintiff being treated as a second class citizen in the and denied him equal protection under the law.

(ECF No. 38, at ¶¶ 100-101).

However, Lane has not pointed to any facts in the record before this court that supports this claim. Lane simply states that Defendants stopped him because "they perceived . . . that a black male was "eyeballing" them." (ECF No. 70). Instead, the record supports that Defendants stopped Lane not because of his race, but because they believed he may be intoxicated. For these reasons, summary judgment on Counts IX and XII is granted.

## VI. <u>Conspiracy Claim (Claim VIII)</u>

Lane also claims that Defendants conspired to violate his civil rights under 42 U.S.C. 1985 "by agreeing among themselves to engage in the conduct set forth above." (ECF No. 38, at ¶ 97).

15

In contrast, Defendants claim that Lane has not shown that they arrested him on the basis of his race.

A plaintiff may bring an action under 42 U.S.C. 1985(3) for conspiracy if he or she can show a conspiracy was formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *See* 42 U.S.C. § 1985(3); *see also Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006). To show conspiracy under § 1985(3), a plaintiff must prove: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). Further, the Supreme Court has held that the second element "must be motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* at 829.

Lane broadly contends that Defendants stopped him because he, a black male, was "eyeballing" them. (ECF No. 70). However, after reviewing all the submissions before the court, Lane has not shown any evidence that Defendants were motivated by a racial, invidiously discriminatory animus when they arrested him. Instead, the record supports that Defendants stopped Lane because they suspected he might be intoxicated. For these reasons, summary judgment on Count VIII is granted.

## VII. Injunctive Relief (Claim X)

Lane additionally seeks injunctive relief in the form of "a temporary and permanent injunction against Defendants and their unconstitutional policies and procedures." (ECF No. 38, ¶ 107). Though Lane's complaint does not identify which policy and procedure he is seeking

injunctive relief from, he identified at his deposition that the policy he is challenging is the "Standard Operation Procedures and Guidelines for Disposition of Offenders/Enforcement Action at the Sandy Hook Unit of Gateway." (*See* ECF No. 62-14, at 201). These guidelines provide that when a visitor is arrested at Sandy Hook, and is later required to appear in court, the visitor "may be issued a lawful order to leave the Park and not to return until the case has been resolved either by payment of the collateral forfeiture or by judicial or U.S. Attorney decision." (ECF No. 62-13, at 2). Defendants argue that Lane lacks standing to seek injunctive relief, and any relief he seeks is prospective.

Standing requires a plaintiff demonstrate that he or she has "(1) suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Clark v. Burger King Corp.*, 255 F. Supp. 2d 334, 341 (D.N.J. 2003). When a plaintiff seeks prospective injunctive relief, he or she must show a "real and immediate threat of injury in order to satisfy the injury in fact requirement." *Id.* at 342; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 103-104 (1983). Further, "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Id.* (quotation omitted). Accordingly, "[i]n order to obtain standing for prospective relief, the plaintiff must 'establish a real and immediate threat that he would again [be the victim of the allegedly unconstitutional practice.]'" *Brown v. Fauver*, 819 F.2d 395, 400 (3d Cir. 1987) (quoting *Lyons*, 461 U.S. at 105).

In the instant case, summary judgment is proper for Lane's claim for injunctive relief as Lane has failed to show any real and immediate threat that he would again would be the victim of any unconstitutional conduct by Defendants. Lane claims that he was instructed not to return to Sandy Hook, and has been harassed multiple times since returning to Sandy Hook. (*See* ECF No. 62-14, at 201). However, Lane admits that since 2014, he has returned to Sandy Hook more than once per year. (ECF No. 70-1, at ¶ 46). Lane also admitted to buying annual passes to Sandy Hook in 2017, and in either 2015 or 2016. (*Id.* at ¶ 47). Finally, Lane admits that he has not been banned from Sandy Hook since his initial arrest in 2014. (*Id.* at ¶ 48). While Lane alleges he is subject to harassment when he visits Sandy Hook, a review of the evidence submitted in support of that allegation shows the claim is without merit. Accordingly, Lane has not shown he is the victim of any real and immediate threat of unconstitutional conduct by Defendants. For these reasons, summary judgment on Count X is granted.

## ORDER

IT IS on this 23 day of Aug., 2018,

**ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part, as follows:

1. Count I (Deprivation of federal civil rights) **DENIED**;

2. Count II (Unlawful Seizure of person) is **DENIED**;

3. Count III (Excessive Force) is **GRANTED** in its entirety;

4. Count IV (False Arrest) is **DENIED**;

5. Count V (Unlawful Search and Seizure of property) is **DENIED**;

6. Count VI (Cruel and Unusual Punishment) is **GRANTED** in its entirety;

7. Count VII (Malicious Abuse of Process and Malicious Prosecution) is **GRANTED** in its entirety;

8. Count VIII (Conspiracy to Violate Civil Rights) is **GRANTED** in its entirety;

9. Count IX (Violation of the Equal Protection Clause) is **GRANTED** in its entirety;

10. Count X (Declaratory Relief) is **GRANTED** in its entirety;

11. Count XII (Violation of New Jersey Civil Rights Act) is **GRANTED** in its entirety; and

12. Counts XI and XIII (Joint and Several Liability) is **GRANTED** in its entirety.

_____
PETER G. SHERIDAN, U.S.D.J.